**EXHIBIT 4
TO COMPLAINT
CASE NO: 1:06CV00650**

James W. Dabney (JD 9715)
Henry C. Lebowitz (HL 5163)
Karen G. Horowitz (KH 5901)
Victoria J.B. Doyle (VD 6209)
Scott D. Miller (SM 0616)
William L. Marino (WM 5420)

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
One New York Plaza
New York, New York 10004-1980
Telephone: 212-859-8000
Facsimile: 212-859-4000

Attorneys for Plaintiff
National Trust for Historic Preservation

**JUDGE McKENNA**

**05 CV 9465**

RECEIVED
NOV 08 2005
U.S.D.C. S.D.N.Y.
CASHIERS

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
NATIONAL TRUST FOR HISTORIC PRESERVATION,

    Plaintiff,

- against -

NATIONAL ARCHITECTURAL TRUST, INC., STEVEN
L. McCLAIN, and JAMES M. KEARNS,

    Defendants.
------------------------------------------------------------x

**COMPLAINT**

**JURY TRIAL DEMANDED**

    Plaintiff National Trust for Historic Preservation, by its attorneys, for its complaint in this action alleges:

**PARTIES AND JURISDICTION**

    1.    Plaintiff National Trust for Historic Preservation (the "NTHP") is a congressionally chartered corporation organized and existing under the laws of the United States, 16 U.S.C. §§ 468

et seq., having its principal place of business at 1785 Massachusetts Avenue, N.W., Washington, D.C.

2. Upon information and belief, defendant National Architectural Trust, Inc. ("NATI") is a corporation organized and existing under the laws of the District of Columbia, having its principal place of business at 1906 R Street, N.W., Washington, D.C. 20009.

3. Upon information and belief, defendant Steven L. McClain ("McClain") is an individual resident of the District of Columbia, having an address at 4541 W Street, N.W., Washington, D.C. 20007.

4. Upon information and belief, defendant James M. Kearns ("Kearns") is an individual resident of the District of Columbia, having an address at 1200 14th Street, N.W., #910, Washington, D.C. 20005.

5. This action arises under the Trademark Act of 1946, 15 U.S.C. §§ 1051 et seq.; the New York General Business Law, N.Y. Gen. Bus. Law §§ 349-50, 360-l; and the common law of the State of New York.

6. Jurisdiction of this Court is proper under 15 U.S.C. § 1121, 28 U.S.C. §§ 1331, 1338(a) and (b), and 28 U.S.C. § 1367.

**FIRST CAUSE OF ACTION**

7. NTHP is a charitable, educational, and non-profit corporation that Congress established in 1949. Congress established NTHP to receive donations of sites, buildings, and objects significant in American history and culture; to preserve and administer sites, buildings, and objects significant in American history and culture for public benefit; and to accept, hold, and administer gifts of money and property for the purpose of carrying out NTHP's public service

mandate. NTHP's actual full legal name, as set forth in the Act of Congress that established NTHP signed by President Truman, is "National Trust for Historic Preservation in the United States." Excerpts from the Act of Congress establishing NTHP are annexed hereto as Exhibit 1.

8. For more than fifty-five (55) years, NTHP has made continuous use of NATIONAL TRUST and NATIONAL TRUST FOR HISTORIC PRESERVATION as names and marks identifying NTHP and charitable, educational, and historic preservation activities carried on by NTHP in the public interest. NTHP is the owner of U.S. Reg. No. 2,631,873 for NATIONAL TRUST FOR HISTORIC PRESERVATION and U.S. Reg. No. 2,659,539 for NATIONAL TRUST FOR HISTORIC PRESERVATION AND DESIGN, both claiming first use in United States commerce on December 31, 1949. NTHP has relations of trust and confidence with thousands of donors and volunteers who support NTHP's charitable, educational, and historic preservation missions.

9. Long prior to 2001, the names NATIONAL TRUST and NATIONAL TRUST FOR HISTORIC PRESERVATION were famous and symbolized extensive goodwill associated with NTHP and its public service, charitable, and educational activities. In the year ended September 30, 2004, NTHP received cash and non-cash contributions totaling more than $24 million from individual, institutional, and corporate donors located throughout the United States. NTHP has approximately 4,019 members in this Southern District of New York and approximately 24,000 members in the State of New York.

10. Upon information and belief, defendants are engaged in the business of developing, marketing, and selling abusive tax shelters and related services as described in Exhibit 2 hereto. In particular, defendants McClain and Kearns use defendant NATI to solicit purportedly "charitable" "gifts" of money and "façade conservation easements," in consideration of which "gifts" defendant

NATI provides advisory, administrative, and other services that purportedly entitle NATI "donors" to claim tax deductions in amounts that vastly exceed any value received or retained by NATI, or that convey to NATI few, if any, rights or benefits of comparable financial value to the "donor."

11. Defendants have solicited "gifts" of cash and "façade conservation easements" by means of an array of false and deceptive practices in New York and in commerce subject to regulation by Congress, including the following:

(a) Defendants have adopted and used a fictitious name and service mark, "National Architectural Trust," that was and is deceptively similar to that of NTHP;

(b) Defendants have attempted to pass off defendant NATI as a charitable "trust" acting solely in the public interest, when in truth and in fact, defendants McClain and Kearns have used NATI as a "front" for commercial business activities and as a conduit for fees paid for services but disguised as "gifts" to NATI;

(c) Defendants have solicited purported charitable contributions in New York without using the designation "Inc." and without complying with applicable New York State disclosure and registration requirements for foreign non-profit corporations or fiduciaries;

(d) Defendants have falsely represented to prospective donors that "[t]he National Architectural Trust exists for the sole purpose of historic preservation," when in truth and in fact, defendant NATI exists at least in part to generate income for its founders and controlling operators, defendants McClain and Kearns;

(e) Defendants McClain and Kearns have used NATI to launder and disguise (as purportedly "charitable" and tax-deductible "gifts" purportedly made to NATI) cash fees paid by NATI "donors" for tax shelter services provided by Springfield Management Services, Inc. ("SMS"), a for-profit corporation controlled by Kearns and McClain whose commercial activities at relevant times included (i) soliciting donations of "façade conservation easements" and accompanying cash payments, (ii) preparing and processing applications for "approvals" and "certifications" needed for would-be NATI "donors" to attempt to claim tax deductions for "façade conservation easements" granted to defendant NATI, (iii) interacting with mortgage lenders on behalf of would-be "donors" of such easements, and (iv) referring would-be "donors" to purportedly "independent" appraisers in whose work McClain and Kearns had direct pecuniary interests;

(f) Defendants have solicited cash contributions for the so-called "National Architectural Trust" without disclosing to donors that at relevant times a substantial portion of all such contributions went into the pockets of McClain's and Kearns' for-profit corporation, SMS, whose for-profit businesses include presenting "seminars" and providing information on how to attempt to exploit federal income tax laws relating to charitable deductions for "gifts" of "property" having historic value;

(g) Defendants have made false or misleading representations suggesting that "façade conservation easements" "donated" to NATI would purportedly entitle their "donors" to take income tax deductions in amounts equal to 10-15% of the total value of the property involved, when in truth and in fact, "façade conservation easements" solicited by NATI could be illusory and worthless;

(h) Defendants have caused NATI to hold itself out as purportedly engaging in "educational" and "historic preservation" activities that bear a superficial similarity to public service activities long engaged in by NTHP;

(i) Defendants have made, or caused to be made, false and misleading statements suggesting that NATI purportedly has a special relationship with the National Park Service; and

(j) Defendants have made or caused to be made false and misleading statements suggesting that NATI was specifically approved by the Internal Revenue Service to hold easements.

12. Defendants have caused the fictitious name, "NATIONAL ARCHITECTURAL TRUST," to be registered on the Supplemental Register of the United States Patent and Trademark Office under U.S. Reg. No. 2,787,726 (the "'726 Registration"), claiming first use in commerce of February 2001. As a matter of law, registration of a mark on the Supplemental Register constitutes an admission that the mark is "merely descriptive" of the goods or services recited in the registration. Applications for registration of marks on the Supplemental Register are not published for opposition. Registrations of marks on the Supplemental Register do not constitute evidence that the registrant has any exclusive right to use the registered mark in commerce.

13. The conduct of defendants, including their use and registration of the name "NATIONAL ARCHITECTURAL TRUST" as a purported designation for the "educational"

- 5 -

services recited in the '726 Registration, is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of defendants with NTHP, or as to the origin, sponsorship, or approval of defendants' goods, services, or commercial activities by NTHP.

14. Defendants have made, or caused to be made, false or misleading representations of fact in commercial advertising or promotion that misrepresent the nature, characteristics, or quality of defendant NAT's goods, services or commercial activities.

15. Upon information and belief, defendants McClain and Kearns have personally caused, induced, and participated in the conduct of defendant NATI identified above.

16. NTHP believes that it is likely to be damaged by the conduct of defendants alleged in paragraphs 1-15, above, and that it is or will be damaged by the continued registration and use of NATIONAL ARCHITECTURAL TRUST to defendant NATI.

17. On information and belief, the conduct of defendants alleged in paragraphs 1-15, above, has been willful, wanton, and deliberate. Defendants have refused repeated demands by NTHP that they cease use of the name NATIONAL ARCHITECTURAL TRUST. Defendants have persisted in their use of NATIONAL ARCHITECTURAL TRUST despite having actual knowledge that their use of that name has caused actual confusion of one or more "donors" to defendant NATI.

18. The conduct of defendants has caused and threatens NTHP with irreparable injury for which NTHP has no adequate remedy at law. The Court has power to order the cancellation of the '726 Registration under 15 U.S.C. § 1119.

19. Defendants are liable to NTHP, jointly and severally, for violation of 15 U.S.C. § 1125(a)(1).

## SECOND CAUSE OF ACTION

20. Paragraphs 1-19, above, are realleged and incorporated by reference as if set forth in full.

21. The conduct of defendants is likely to injure and tarnish NTHP's business reputation and to dilute the distinctive quality of NATIONAL TRUST and NATIONAL TRUST FOR HISTORIC PRESERVATION as names and marks associated with NTHP.

22. The conduct of defendants has attracted significant negative publicity for the "NATIONAL ARCHITECTURAL TRUST" as exemplified by the December 14, 2004, editorial of The Washington Post annexed hereto as Exhibit 2.

23. Defendants are liable to the NTHP, jointly and severally, for dilution under New York General Business Law § 360-1.

## THIRD CAUSE OF ACTION

24. Paragraphs 1-23, above, are realleged and incorporated by reference as if set forth in full.

25. The conduct of defendants alleged in paragraphs 10-17, above, was consumer-oriented.

26. The conduct of defendants alleged in paragraphs 10-17, above, was misleading in a material way.

27. The conduct of defendants alleged in paragraphs 10-17, above, has caused injury to NTHP, including a loss of control over NTHP's own reputation and actual deception and confusion of one or more persons who dealt with defendant NATI out of a mistaken belief that they were dealing with NTHP.

28. Defendants are liable to NTHP, jointly and severally, for violation of N.Y. Gen. Bus. Law §§ 349 and 350.

## FOURTH CAUSE OF ACTION

29. Paragraphs 1-28, above, are realleged and incorporated by reference as if set forth in full.

30. The conduct of defendants alleged in paragraphs 10-17, above, was and is commercially immoral.

31. By their conduct alleged above, defendants have attempted to pass off defendant NATI as a charitable "trust" operating solely in the public interest, when in truth and in fact, NATI has been used by McClain and Kearns as a "front" for commercial activities of SMS and as a conduit for fees paid for services provided by SMS but disguised as purported "gifts" to NATI.

32. By their conduct alleged above, defendants have attempted to sponge and feed off of the hard-earned reputation of NTHP for charitable, educational, and historic preservation activities in the public interest.

33. Upon information belief, defendants have acted with deliberate, bad faith intent to mislead residents of New York and elsewhere and with callous disregard for the rights of NTHP.

34. Defendants are liable to NTHP, jointly and severally, for unfair competition and misappropriation under New York law.

WHEREFORE, NTHP prays that the Court:

    (i) declare, adjudge, and decree that defendants are liable to NTHP, jointly and severally, for violations of 15 U.S.C. § 1125(a);

    (ii) declare, adjudge, and decree that defendants are liable to NTHP, jointly and severally, for dilution under N.Y. Gen. Bus. Law § 360-l;

(iii) declare, adjudge, and decree that defendants are liable to NTHP, jointly and severally, for violations of N.Y. Gen. Bus. Law §§ 349-350;

(iv) declare, adjudge, and decree that defendants are liable to NTHP, jointly and severally, for unfair competition and misappropriation under New York common law;

(v) grant preliminary and permanent injunctions restraining defendants from engaging in any further acts constituting service mark infringement, trade name infringement, false advertising, unfair competition, dilution, or misappropriation;

(vi) grant preliminary and permanent injunctions ordering defendants to disgorge monies obtained from donors under false pretenses;

(vii) order the cancellation of the '726 Registration;

(viii) award NTHP compensatory damages as provided by law;

(ix) award NTHP punitive damages as provided by law;

(x) award NTHP its costs, disbursements, and attorneys' fees incurred in bringing this action; and

(xi) award NTHP such other and further relief as the Court may deem just and proper.

Dated: New York, New York
November 8, 2005

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP

By _____
James W. Dabney (JD 9715)
Henry C. Lebowitz (HL 5163)
Karen G. Horowitz (KH 5910)
Victoria J.B. Doyle (VD 0616)
Scott D. Miller (SM 0616)
William L. Marino (WM 5420)
One New York Plaza
New York, New York 10004
Tel. (212) 859-8000

Attorneys for Plaintiff

520080

# EXHIBIT 1

# Eighty-first Congress of the United States of America
## At the First Session

Begun and held at the City of Washington on Monday, the third day of January, one thousand nine hundred and forty-nine



## AN ACT

To further the policy enunciated in the Historic Sites Act (49 Stat. 666) and to facilitate public participation in the preservation of sites, buildings, and objects of national significance or interest and providing a national trust for historic preservation.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That, in order to further the policy enunciated in the Act of August 21, 1935 (49 Stat. 666), entitled "An Act to provide for the preservation of historic American sites, buildings, objects, and antiquities of national significance, and for other purposes," and to facilitate public participation in the preservation of sites, buildings, and objects of national significance or interest, there is hereby created a charitable, educational, and nonprofit corporation, to be known as the **National Trust for Historic Preservation in the United States,** hereafter referred to as the "National Trust." The purposes of the National Trust shall be to receive donations of sites, buildings, and objects significant in American history and culture, to preserve and administer them for public benefit, to accept, hold, and administer gifts of money, securities, or other property of whatsoever character for the purpose of carrying out the preservation program, and to execute such other functions as are vested in it by this Act.

*[excerpt of sections]*

SEC. 2. The National Trust shall have its principal office in the District of Columbia and shall be deemed, for purposes of venue in civil actions, to be an inhabitant and resident thereof. The National Trust may establish offices in such other place or places as it may deem necessary or appropriate in the conduct of its business.

*[...]*

SEC. 7. The right to repeal, alter or amend this Act at any time is hereby expressly reserved, but no contract or individual right made made or acquired shall thereby by divested or impaired.

*Speaker of the House of Representatives.*

*Vice President of the United States and President of the Senate.*

APPROVED

OCT 26 1949

# EXHIBIT 2

THE WASHINGTON POST, Tuesday, December 14, 2004

**EDITORIAL**

## A For-Profit Facade?

Page A26

STROLL THROUGH Georgetown, Capitol Hill or Old Town Alexandria, and the aesthetic benefits of historic preservation are apparent. Less obvious—but for homeowners a motivating factor, along with safeguarding the architectural charm of their neighborhoods—are the tax benefits. As detailed by The Post's Joe Stephens, a growing number of homeowners, in the Washington area and around the country, are taking hefty tax deductions for donating "facade easements"—promises not to alter the outward appearance of their homes without permission. Though such changes may already be barred by local ordinances, and granting such an easement may not actually diminish the resale price, the taxpayers generally get breaks amounting to about 11 percent of their homes' value.

Even more disturbing, the practice of peddling these donations has turned into a lucrative business for some supposedly nonprofit groups. Mr. Stephens described the operations of one local nonprofit, the National Architectural Trust, which in the past four years took in nearly $17.5 million in "contributions"—actually administrative fees. In 2003 alone, the trust paid more than $5.5 million to a for-profit facilitation company—which pitches the easements and processes the paperwork—owned by the nonprofit's founders. After being contacted by The Post, the owners, James M. Kearns and Steven McClain, said they planned to donate their company's assets back to the trust, "to make it look squeaky clean."

There's no problem in theory with such easements; indeed, they ought to be encouraged, which is precisely the point of the tax break. Local ordinances are subject to change, so there is value in the commitment in perpetuity provided by an easement. The difficulty arises in accurately valuing that commitment—and six-figure deductions, particularly where historic preservation statutes already are in place, seem dubiously inflated.

The Internal Revenue Service, until recently, has been worse than lax in its policing of these easements: It has actually suggested that such inflated valuations are appropriate. To its credit, the IRS is now taking a more aggressive stance toward regulating charities. As part of that effort, it ought to take a closer look not only at the easements themselves but at "easement mills," such as that run by Messrs. Kearns and McClain, which have a built-in incentive to abuse the deduction.

Indeed, the operation of their nonprofit organization, with its generous salaries and lucrative for-profit enterprise that reaped millions in fees, points up a broader problem with the administration of nonprofits and their oversight by the IRS. Lavish compensation packages, deals that enrich insiders, sleepy boards of directors, loose financial controls—many of the same problems that plagued corporate America are replicated in the nonprofit sector. "There are increasing indications of failures in governance and outright abuse within this sector," IRS Commissioner Mark W. Everson told the Senate Finance Committee. The Post's reports on Sunday and yesterday present yet another one.

© 2004 The Washington Post Company

22